**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

American Federation of Government Employees, AFL-CIO, *et al.*,

Plaintiffs,

v.

U.S. Equal Employment Opportunity Commission, *et al.*,

Defendants.

Case No. 1:26-cv-02640-CKK

# REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION AND FAILURE TO STATE A CLAIM FOR RELIEF

## TABLE OF CONTENTS

INTRODUCTION .......... 1

I. Plaintiffs have not salvaged their Article III standing .......... 2

A. Harassment at FCC Pollock is not traceable to the EEOC and not redressable through this APA suit .......... 2

B. AFGE has not identified a member with standing or shown any cognizable injury to itself .......... 7

II. Alternatively, the Court lacks jurisdiction because the case is moot .......... 9

III. Plaintiffs have not articulated a plausible basis for APA review .......... 10

A. Title VII affords an adequate, if not superior, remedy .......... 10

B. The APA claims target a chimera .......... 13

CONCLUSION .......... 15

## INTRODUCTION

Plaintiffs' opposition brief, ECF No. 31 (Opp'n), merely confirms that this case should be dismissed for any of multiple reasons. No Plaintiff has standing. The only purported cognizable, concrete injury in fact alleged by Chelette and Boyd[1] is the alleged discrimination and harassment they face from inmates and managers at FCC Pollock. This harm is not fairly traceable to the EEOC's challenged conduct; it is solely attributed to the independent actors at FCC Pollock. Likewise, as Plaintiffs concede, no judicial relief under the APA can remedy this harm. As for AFGE, it has not shown any member with standing to sue the EEOC and so cannot piggyback its way into court. Nor has the union demonstrated a concrete injury to its core business activities that might suffice for organizational standing.

Although the EEOC initially did not raise mootness (purely to present the cleanest possible motion to dismiss), we agree with Plaintiffs that, given our forthcoming discovery response, the Court should consider the issue now. The EEOC's discovery response will confirm that any dispute over the alleged Suspension Directive is no longer live. Any pause of federal-sector class complaints, such as *Pippen*, was a mistake of intermediate officials, promptly corrected by agency leadership as soon as they became aware of the situation.

Besides the lack of subject-matter jurisdiction, Plaintiffs' APA claims remain unviable. The D.C. Circuit has repeatedly held that APA review against an agency for failure to rectify the wrongdoing of a third party is unavailable when the plaintiff has a statutory cause of action against the third party. And case law specifically recognizes *de novo* review of a discrimination claim under Title VII qualifies as such an adequate, alternate remedy. Plaintiffs provide no basis why these twin strands of precedent should not apply here.

Relatedly, Plaintiffs have not plausibly alleged the final agency action necessary for an APA claim under 5 U.S.C. § 706(2). A pause of federal-sector class cases for a few months did not determine anyone's legal rights or obligations, nor did it create legal consequences. Plaintiffs'

[1] The EEOC carries through all abbreviations and shorthand references from its opening brief.

alternate approach under 5 U.S.C. § 706(1) fares no better. The only potential, discrete actions that the Court might compel are the final orders resolving individual EEOC proceedings. Yet Plaintiffs expressly disclaim any challenge to the processing or outcome of a particular EEOC administrative complaint. That leaves them without any viable APA theory.

The Court should dismiss this case.[2]

## I. Plaintiffs have not salvaged their Article III standing

### A. Harassment at FCC Pollock is not traceable to the EEOC and not redressable through this APA suit

The defense of Chelette's and Boyd's standing falters out of the gate. They claim we "err in characterizing the asserted injury as an abstract interest in lawful agency administration." Opp'n 7. Then in the next breath, Chelette and Boyd assert standing based on "the EEOC's failure to follow its regulations and congressional mandate under Title VII." *Id.* 8. But as we said, their desire for the EEOC's "observance of a particular" or "statutorily prescribed procedure" *is* nothing more than an "interest 'in proper administration of the laws,'" which both the D.C. Circuit and Supreme Court are clear "does not amount to a concrete or particularized Article III injury." Mot. (ECF No. 27) 5 (quoting *Campaign Legal Ctr. v. Fed. Election Comm'n*, 860 F. App'x 1, 4 (D.C. Cir. 2021)); *see, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992). An "alleged violation of a right to have the Government act in accordance with law [i]s not judicially cognizable." *Lujan*, 504 U.S. at 575.

Nor is it enough that Chelette and Boyd were part "of a certified class whose adjudication was halted." Opp'n 8. Article III standing requires more than "mere 'participation in agency proceedings.'" Mot. 4 (quoting *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002) (citation modified)). Just like the entities in the cases we cited, *see* Mot. 5 (citing *Campaign Legal Ctr.*, 860 F. App'x at 4; *Csoka v. FDA*, No. CV 24-1486 (ABJ), 2025 WL 958364, at *2

[2] Although the EEOC maintains no discovery is necessary for the Court to grant this motion, the agency acknowledges the Court's recent finding that "limited discovery . . . will help" determine "Plaintiffs' standing." ECF No. 30, at 3.

(D.D.C. Mar. 31, 2025)), Chelette and Boyd must show the agency's conduct of a proceeding "caused" them a "concrete injury," *Lujan*, 504 U.S. at 562, 576. After all, "an injury in law is not an injury in fact." Mot. 5 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021)).

Plaintiffs acknowledge—as they must—that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see* Opp'n 8. Chelette and Boyd assert an "interest in a workplace free of discrimination and harassment, which Title VII and EEOC regulations are designed to protect." Opp'n 8. But "concrete interest" means "a harm capable of satisfying Article III." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). And a desire to enforce the prohibitions on workplace discrimination and harassment is nothing more than an "abstract" interest in the proper administration of the law that cannot satisfy Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

Even assuming the facts alleged in the Complaint, the only "*de facto*" harm that "actually exist[s]," *id.*, mentioned by Chelette and Boyd is the "discrimination and harassment" they allegedly are suffering at FCC Pollock, Opp'n 8. Contrary to Plaintiffs' bald assertion, no challenged action (or inaction) of the EEOC "causes [*that*] harm." *Id.* Chelette and Boyd squarely attribute the alleged discrimination and harassment to the "male inmates at FCC Pollock" and the prison "management" who have "sent the message to the inmates that they can get away with sexual misconduct towards female staff." Chelette Decl. (ECF No. 13-3) ¶¶ 2, 5; Boyd Decl. (ECF No. 13-4) ¶¶ 2, 5, 6.

Chelette and Boyd grudgingly concede their "theory of harm may involve the actions of third parties," Opp'n 10—that is, the inmates and management of FCC Pollock. Because their "asserted injury arises from the government's allegedly unlawful . . . lack of regulation[] of *someone else*"—those same inmates and managers—"much more is needed" to establish standing. *Lujan*, 504 U.S. at 562. For "the necessary link" between the conditions at FCC Pollock and the EEOC, Chelette and Boyd cite their "declarations stating that harassment has

worsened, that management perceives it can act without consequence, and that employees have already left FCC Pollock as a result of the continued harassment." Opp'n 8. Those declarations simply say that "[a]fter the EEOC judge certified the *Pippen* case as a class action and started to send notice to class members in 2025,"[3] prison "management has emboldened the inmates to sexually harass female staff even more than before." Chelette Decl. ¶ 4; Boyd Decl. 13-4 ¶ 7. That does not establish "a fairly traceable connection between" prison management's purported emboldening of inmates to harass female staff and "the complained-of conduct of" the EEOC. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). Rather, the harassment alleged by Chelette and Boyd wholly "results from the independent action of" third-party inmates and prison managers who are "not before the court." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976).

Plaintiffs try to escape this basic truth by claiming the worsening "harassment and management's failure to correct it" are "the predictable consequences of the [alleged] Suspension Directive." Opp'n 10. But there is no evidence that "the 'entire purpose' of" the alleged pause in federal-sector class cases was "to induce certain behavior from" the inmates and management at FCC Pollock or that the "intended effect" was to facilitate harassment. *Or. Env't Council v. Internal Revenue Serv.*, 836 F. Supp. 3d 1, 26–27 (D.D.C. 2026). Nor is there any correlation between the EEOC's processing of *Pippen* since February 2024, ECF No. 13-5, at 2, and the behavior of the inmates and management at FCC Pollock. If anything, Chelette and Boyd describe an uptick in harassment at the facility after the administrative judge ruled *in their favor* by certifying *Pippen* as a class case. Chelette Decl. ¶ 4; Boyd Decl. ¶ 7. Thus, Plaintiffs have not established the EEOC's challenged conduct had any effect—much less, predictable consequences—on the independent actions of those at FCC Pollock.

Third parties also preclude Chelette and Boyd from showing redressability. Redressability is "substantially more difficult to establish" when it "depend[s] on future choices by" third parties,

---

[3] To be precise, the EEOC administrative judge's class decision issued in *March* 2025 and was accepted by the Department of Justice in *April* 2025. ECF Nos. 13-7, 13-8.

"whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) (quoting *Lujan*, 504 U.S. at 562). Here, "[e]ven if the alleged 'Suspension Directive' were set aside (assuming, as we must, that it exists)," relief from the alleged harassment still "would depend, at a minimum, on subsequent discretionary decisions by independent actors at the EEOC and the Bureau of Prisons." Mot. 7. For example, the *Pippen* "administrative judge finds in [complainants'] favor on the merits and orders remedial action *and* the Bureau of Prisons agrees to 'fully implement the decision of the administrative judge' *or* the EEOC's Office of Federal Sector rejects any appeal that the Bureau of Prisons might file." *Id.* 6 (quoting 29 C.F.R. § 1614.204(j)). Or if the complainants were to lose in *Pippen*, relief requires filing and ultimately prevailing in a Title VII action in federal court. All this "'guesswork as to how independent decisionmakers will exercise their judgment' do[es] not suffice" to establish redressability. *Hecate Energy*, 126 F.4th at 666 (quoting *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024)).

Plaintiffs know this. As we highlighted—without rebuttal—they expressly *conceded* the alleged "hostile work environment" at FCC Pollock "cannot be repaired by an eventual final judgment in this APA case." Mot. 7 (quoting ECF No. 13-1, at 24). Chelette and Boyd try to elide the problem by saying "the Suspension Directive decreases Plaintiffs' likelihood of obtaining classwide relief"—whether from "lost witnesses, fading memory, impaired notice," or otherwise—"and that vacating the Suspension Directive will redress that harm." Opp'n 9. But "the mere increased risk" that the complainants will not obtain class-wide relief through *Pippen* "is utterly abstract—not concrete, direct, real, and palpable." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297 (D.C. Cir. 2007). Nor, as the EEOC emphasized, have Plaintiffs clearly alleged *facts*—rather than conclusory assertions—showing "a substantial probability of this occurring in *Pippen*," Mot. 6, and that it would not be attributable to the general passage of time for a matter pending since 2024.

Plaintiffs seek "restoration of class-complaint processing . . . without dictating the outcome of any underlying discrimination claim." Opp'n 2. Therein lies the rub. Only a favorable

resolution of the underlying discrimination claim in *Pippen* "will likely alleviate" Chelette's and Boyd's alleged injury. *Hecate Energy*, 126 F.4th at 665 (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (en banc)). However, it is "just as plausible," *Hecate Energy*, 126 F.4th at 666 (citation modified), that the alleged harassment—the only cognizable, concrete injury at issue—will continue notwithstanding any relief ordered by this Court; for example, if the administrative judge rules against the *Pippen* complainants, or the EEOC's Office of Federal Sector rules against the *Pippen* complainants, or the Bureau of Prisons decides not to implement remedial measures and a federal court rejects a Title VII claim that may be filed. This "guesswork" means "Article III's redressability requirement is not met." *Id.* (citation modified).

The decision in *America First Legal Foundation v. Greer*, 153 F.4th 1311 (D.C. Cir. 2025), is instructive about why Chelette and Boyd's theories of causation and redressability fail. America First Legal Foundation (AFL) sought "to compel the Office of Special Counsel to investigate whether a federal agency arbitrarily denied AFL's Freedom of Information Act request." *Id.* at 1313. "For one thing," the D.C. Circuit said, the alleged "injury from DOJ's refusal to disclose agency records is plainly traceable to DOJ—not OSC." *Id.* at 1315. And the "causal connection between OSC's failure to conduct" an investigation into withholdings prohibited by FOIA and "DOJ's failure to comply with the FOIA request is too speculative and attenuated to support Article III standing." *Id.* Even if the court ordered an OSC investigation, redress of the alleged informational injury "requires speculation about choices by" independent actors, like DOJ, who are "not parties to this lawsuit." *Id.* The same flaws are present here: the alleged harassment is not caused by the EEOC and a judicial order against the EEOC will not redress that injury.

Both cases cited by Plaintiffs (Opp'n 9) are readily distinguishable. In *Electric Power Supply Association v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004), the alleged harm was caused by FERC's own actions; here though, the alleged harassment at FCC Pollock is not caused by the EEOC. In *Teton Historic Aviation Foundation v. U.S. Department of Defense*, 785 F.3d 719, 724-25 (D.C. Cir. 2015), there was no "dispute that Teton has satisfied the injury in fact and causation

requirements" because the challenged DOD policy "effectively barred the public sale of almost all the parts Teton seeks." And the injury was likely redressable by setting aside the policy because DOD "has incentives" to resume selling parts and so did the company that was "a mere pass-through for the Department's equipment sales." *Id.* at 725. By contrast here, Plaintiffs offer no evidence of a comparable incentive to grant them relief by the Bureau of Prisons (the agency respondent in *Pippen*) or the neutral arbiters of *Pippen* at the EEOC.

At bottom, Chelette and Boyd have not established standing.

### B. AFGE has not identified a member with standing or shown any cognizable injury to itself

Because Chelette—the only actually identified member of AFGE—lacks standing, she cannot support AFGE's associational standing. *See* Mot. 5. AFGE also claims that several unidentified "members are part of the class in *Pippen*" and "would have standing to challenge the Suspension Directive for the same reasons as Plaintiff Boyd." Opp'n 11. But because Boyd lacks standing, *see supra*; Mot. 5-7, those other members do too and therefore cannot provide associational standing.

As a last gasp, AFGE invokes unidentified members who supposedly "are class members or class agents" in "other pending complaints" before the EEOC. Opp'n 11. However, this "runs afoul of the baseline requirement to *identify a particular member* of the organization that was injured." *Conf. of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 299 (D.D.C. 2018) (emphasis added). Even if it sufficed, AFGE tepidly states that these mystery members "*may be affected* by the EEOC's suspension of class complaints." Roberson Decl. (ECF No. 13-2) ¶ 15 (emphasis added). Likewise, the Opposition baldly declares that "[e]ach of these members is suffering concrete injuries . . . traceable to the [alleged] Suspension Directive." Opp'n 11. What is the precise concrete injury—*i.e.*, the "tangible" or "intangible harms" cognizable under Article III, *TransUnion*, 594 U.S. at 425—that each member asserts? Plaintiffs do not say. In other words, AFGE has not "clearly allege[d] facts demonstrating" an injury in fact for one of these mystery members that would suffice for standing. *Spokeo*, 578 U.S.

at 338. Because we are blind to the concrete harm for each particular mystery member, AFGE necessarily has not clearly shown how such a harm is traceable to the EEOC's challenged conduct—rather than the independent actions of a third party, as with Chelette and Boyd—and redressable by the relief sought from this Court. Thus, AFGE has not established associational standing.

Furthermore, AFGE still fails to demonstrate the harm necessary for organizational standing. As we noted, *see* Mot. 8-9, the Supreme Court made clear in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), that it "does not work to demonstrate standing" for an organization to allege the challenged action had generically "impaired their ability to provide services and achieve their organizational missions," *id.* at 394 (citation modified). And AFGE has not established a concrete harm to its "core business activities," *id.* at 395, such as by showing that the EEOC's challenged conduct involuntarily "subjects" AFGE "to operational costs beyond those normally expended," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015).

On the contrary, we noted how "AFGE attorneys concededly 'will continue to provide[] direct representation to AFGE's members in hundreds of cases before the EEOC,' as well as 'counseling for AFGE's members, including with respect to the EEOC's class complaint process.'" Mot. 9 (quoting Compl. ¶ 15). The Opposition does not dispute this. Plaintiffs also do not rebut our point that whether "AFGE is merely less confident in its 'guidance' and ability to predict 'what will become of a class complaint,'" "is not the sort of 'real' and 'concrete' harm required for standing." Mot. 9 (first quoting Roberson Decl. ¶ 13; then quoting *Spokeo*, 578 U.S. at 340). This silence is as telling as it is fatal for AFGE's standing.

The cases Plaintiffs cite, *see* Opp'n 13, only highlight AFGE's shortcomings. AFGE has not "introduced evidence" of a "decrease in engagement" by stakeholders "it is statutorily required to serve" or that it "has been forced to expend resources beyond what it typically expects to expend in an effort to stay in compliance with its requirements for federal funding." *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 29 (D.D.C. 2025). Similarly, AFGE

has not shown that the alleged Suspension Directive requires "far more resource intensive" activities that will "severely limit the number of individuals [it] may serve." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38–39 (D.D.C. 2020). Neither the case law nor the facts here support organizational standing for AFGE.

## II. Alternatively, the Court lacks jurisdiction because the case is moot

Plaintiffs invite the Court to consider mootness although the issue was not raised in our motion to dismiss. *See* Opp'n 13. The Court can and should do so. *See Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1522 (D.C. Cir. 1994) ("[W]e are obliged to address the issue sua sponte because mootness goes to the jurisdiction of this court."). Frankly, mootness was only omitted from the EEOC's motion with the intent of presenting the cleanest possible grounds for dismissal and avoiding a dispute about discovery. But just as we argued in opposition to Plaintiffs' preliminary-injunction motion, the EEOC has continued to believe this case is moot. *See* ECF No. 18, at 7–8. And the strategic decision to reserve the argument from the motion to dismiss was obviated by the Court's ruling that limited discovery is necessary to assess threshold jurisdictional arguments. *See* ECF No. 30, at 3.

A claim becomes moot "when the issues presented are no longer 'live.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 814 (D.C. Cir. 1982). And "when one agency action supersedes another, prospective challenges to the superseded agency action generally become moot" because "vacating the old agency action will not deliver the plaintiff any relief." *Anderson v. U.S. Dep't of Hous. & Urb. Dev.*, 731 F. Supp. 3d 19, 31 (D.D.C. 2024). Here, as the EEOC has said—and its forthcoming discovery responses will confirm—neither the Commission nor the Chair issued a "Suspension Directive" to administrative judges. Also, before the end of August, the director of the EEOC's Office of Federal Operations," who oversees administrative

judges, "sent a reminder that federal-sector class cases should be proceeding in the ordinary course." ECF No. 20-6, at 2.

Plaintiffs invoke the voluntary cessation exception to mootness, *see* Opp'n 14-15, but it does not prevent dismissal of this suit. The "voluntary cessation of a challenged practice will moot a case" if "the practice cannot reasonably be expected to recur." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation modified). "Far from suspending its challenged conduct after being sued so that it could pick up again after the suit's dismissal," the EEOC immediately "demonstrated its disinterest in the challenged conduct." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 188 F.4th 400, 408 (D.C. Cir. 2026). Since August 10, the agency has reiterated to Plaintiffs and this Court its "agree[ment] that processing of federal-sector class complaints should not be suspended" and disclaimed that the alleged Suspension Directive reflected the actual or official policy of agency leadership. ECF No. 18-4, at 2. "The established law of this circuit is that the voluntary cessation exception to mootness has no play when the agency did not act in order to avoid litigation." *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 (D.C. Cir. 2021) (citation modified). This precedent applies forcefully here. The EEOC is not engaged in gamesmanship; agency leadership never wanted all federal-sector class cases to be suspended in the first place. *See, e.g.*, *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (case was moot "because plaintiffs never allege that the Navy is likely to or even considering reinstituting the Thirds Policy," so "there is no reasonable expectation that the alleged violation will recur" (citation modified)).

Because Plaintiffs "obtained the relief [they] asked for" and the alleged harms from a suspension of proceedings "have been eradicated," this issue "is moot." *Chavis v. Garrett*, 419 F. Supp. 3d 24, 34 (D.D.C. 2019).

## III. Plaintiffs have not articulated a plausible basis for APA review

### A. Title VII affords an adequate, if not superior, remedy

Even if the Court finds that Plaintiffs have standing and there remains a live dispute, the EEOC explained why the case suffers yet more fatal flaws: "Title VII provides an adequate

alternative remedy" to APA review "and the challenged conduct does not rise to the level of final agency action" required under the APA. Mot. 9. Plaintiffs respond that "Title VII is not an 'adequate remedy' because it would not provide Plaintiffs with the relief that they seek—namely, vacatur of the EEOC-wide directive and restoration of the federal-sector class administrative adjudication process required by law." Opp'n 16. But recognizing that "section 704 requires only an *adequate* alternative," the D.C. Circuit "has held that the alternative remedy need not provide relief *identical* to relief under the APA in order to have preclusive effect." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 846 F.3d 1235, 1245 (D.C. Cir. 2017) (*CREW*) (citation modified). And the D.C. Circuit repeatedly has "held that [a] plaintiff could not maintain an action under the APA directly against a federal agency for failure to investigate and rectify the wrongdoing of a third party where Congress had provided the plaintiff with a private right of action against the third party." *Garcia v. Vilsack*, 563 F.3d 519, 524–25 (D.C. Cir. 2009); *see, e.g.*, *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270–71 (D.C. Cir. 2005); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990).

In that vein, our opening brief walked through the numerous precedents from this Circuit holding "that de novo review of EEOC administrative claims under Title VII provides an adequate remedy in a court within the meaning of 5 U.S.C. § 704 for complaints about the EEOC's administrative process . . . [and] procedures." Mot. 10–11 (discussing cases). Plaintiffs agree this case law "bars an APA suit seeking review of the outcome or [the EEOC's] handling of an individual complaint" but disclaim its applicability if the challenge is framed as to a "policy halting an entire administrative adjudicatory process." Opp'n 17. Plaintiffs offer no legal basis for drawing this distinction. The cases, on their face, recognize the "de novo review" process under Title VII as "an adequate remedy in a court within the meaning of 5 U.S.C. § 704 for complaints about the EEOC's administrative process," regardless of whether the complaint targets the EEOC's procedures writ large or their application in a specific proceeding. *Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961, at *1 (D.C. Cir. July 21, 2004).

Furthermore, Plaintiffs' arbitrary distinction would eviscerate the Title VII review scheme created by Congress because litigants would simply recast their challenge as to a general EEOC policy or procedure but not as applied to them. Every time an EEO complainant is dissatisfied with the pace of their proceeding, they could sue the EEOC under the guise that any delays are the product of some silent background policy. And they could maintain that free-floating APA suit against the EEOC even if their underlying discrimination proceeding is dismissed. Title VII's carefully crafted review scheme should not be evaded so readily by such artful pleading.

Plaintiffs complain that litigation under Title VII is less appealing for various reasons. *See* Opp'n 18. But "[t]he relevant question under the APA, then, is not whether private lawsuits against the third-party wrongdoer are as effective as an APA lawsuit against the regulating agency, but whether the private suit remedy provided by Congress is adequate." *Garcia*, 563 F.3d at 525. "The availability of actions against individuals may be adequate even if such actions cannot redress the systemic lags and lapses by federal monitors and even if such suits directly against the discriminating entities may be more arduous, and less effective in providing systemic relief, than continuing judicial oversight of federal government enforcement." *Id.* (citation modified); *see, e.g.*, *Women's Equity Action League*, 906 F.2d at 751 (concluding that "situation-specific litigation affords an adequate, even if imperfect, remedy"); *Council of & for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983) ("Even if we agreed that one nationwide suit would be *more effective* than several section 124 suits, that does not mean that the remedy provided by Congress is *inadequate*.").

And the notion that "Title VII is not an adequate remedy for the failure to process the *class* complaints at issue here" rings false. Opp'n 18. "An alternative remedy will not be adequate under § 704 if the remedy offers only doubtful and limited relief." *Garcia*, 563 F.3d at 522 (citation omitted). More than adequate, a Title VII suit affords the prospect of relief "superior to that available under the APA." *CREW*, 846 F.3d at 1245 (citing *Garcia*, 563 F.3d at 525). Plaintiffs concede the alleged "hostile work environment" at FCC Pollock—the only cognizable, concrete injury alleged by Chelette and Boyd—"cannot be repaired by an eventual final

judgment in this APA case." Mot. 7 (quoting ECF No. 13-1, at 24). Relief under Title VII, though, would redress that problem.

Desperate to avoid the remedial scheme designed by Congress, Plaintiffs wrongly say that "absent class members like . . . Boyd are unable to pursue their individual administrative complaints in court so long as the class complaint is pending." Opp'n 17. As we explained—without rebuttal—"[m]embers of the *Pippen* class, such as Boyd"—or any other member of a federal-sector class case—"also have a path to district court." Mot. 11–12. A "class member who separately files an individual complaint with the" relevant agency "may pursue her claim in district court 180 days after filing her individual complaint." *Id.* 12; *see* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(b). Boyd may not have "pursue[d] [this] particular remedy," but that "plainly does not establish that it" is inadequate. *ACLU v. Trump*, 266 F. Supp. 3d 133, 139 (D.D.C. 2017).

Lastly, AFGE's inability "to bring a Title VII claim for its own injury" hardly "doom[s]" this argument; if anything, this argument only highlights the artificiality of this case. Opp'n 17; *see* 42 U.S.C. § 2000e-16(c) (authorizing suit by "an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint"). AFGE primarily sues on behalf of absent members, *see* Opp'n 10–11, not because of "its own injury." Like Chelette and Boyd, none of those absent and unidentified AFGE members could proceed under the APA because of the Title VII remedy. AFGE cannot piggyback on those members for purposes of standing and then immediately disassociate from them for purposes of APA review.

### B. The APA claims target a chimera

The EEOC's forthcoming discovery responses will confirm that Plaintiffs' APA claims, whether under 5 U.S.C. § 706(1) or 706(2), are based on the false premise that the EEOC actually issued a Suspension Directive. That will render irrelevant any disputes about "agency

action" or "final agency action." Nonetheless, for the sake of completeness, we briefly reply to Plaintiffs' arguments on those points.

If Plaintiffs cannot satisfy either *Bennett* prong of finality, their § 706(2) claims fail. *See* Mot. 13. On the second prong, Plaintiffs contend the alleged Directive "produced immediate legal and practical consequences." Opp'n 19. But Chelette and Boyd (and other similarly situated complainants) were not "trapped without recourse." *Id.* (quoting *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 60 (D.D.C. 2019)). Unlike the Interior Secretary's letter in *Connecticut*, the EEOC did not "prevent[]" employees or agencies "from altering their legal relationship with each other." 363 F. Supp. 3d at 60. Nor did the EEOC's "conduct" leave anyone "unable to resume [their] job" or press their discrimination claims. *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 543 (D.C. Cir. 2016). At all times, those rights could be vindicated under Title VII. Thus, any delay in processing federal-sector class complaints, such as *Pippen*, for a few months did not determine any parties' "rights or obligations," nor did "legal consequences" flow therefrom. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).

Finally, Plaintiffs note that their "third cause of action, brought under 5 U.S.C. § 706(1) for agency action unlawfully withheld or unreasonably delayed does not require final agency action." Opp'n 15. True enough. But "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," which "precludes . . . broad programmatic attack[s]." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The only discrete actions of the EEOC that might be relevant are the final orders resolving individual complaint proceedings. However, Plaintiffs emphasize they "are not challenging the processing or outcome of a particular EEOC administrative complaint." Opp'n 18. So what discrete agency action, within the meaning of 5 U.S.C. § 551(13), is left for the Court to compel under Count III? Plaintiffs do not say. Accordingly, they have not plausibly alleged a claim for relief under § 706(1).

## CONCLUSION

For the foregoing reasons, and those in Defendants' opening brief, the Court should dismiss this case for lack of subject-matter jurisdiction or for failure to state a viable APA claim.

October 20, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

AMBER RICHER
Assistant Director

/s/ James W. Harlow
JAMES W. HARLOW
Senior Trial Counsel
Federal Programs Branch
Civil Division
U.S. Department of Justice
1100 L Street NW
Washington, DC 20005
(202) 514-6786
james.w.harlow@usdoj.gov