**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al*.,
Plaintiffs,

v.

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*,
Defendants.

Civil Action No. 1:26-cv-02640 (CKK)

**PLAINTIFFS' MOTION TO COMPEL DISCOVERY AND PRIVILEGE LOG AND FOR LEAVE TO TAKE LIMITED DEPOSITIONS**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

I. Defendants Denied the Suspension Directive Existed Despite Substantial Evidence of a Coordinated Policy ..... 3

II. Defendants Repeatedly Delayed Their Response to Discovery the Court Ordered ..... 5

III. Defendants' Discovery Responses Reveal Contradictions in Their Prior Representations ..... 7

IV. Defendants Refuse to Produce Additional Responses or Documents After Plaintiffs Attempted to Confer About the Deficiencies ..... 9

ARGUMENT ..... 10

I. Defendants Must Produce Complete Discovery Concerning the Suspension Directive and Its Purported Rescission. ..... 10

A. Defendants improperly withhold specific documents identified in their interrogatory responses ..... 10

B. Defendants improperly withhold discovery about the origin and basis of the Chief Administrative Judge's directive ..... 12

C. Defendants improperly withhold discovery about the full scope of the Suspension Directive's impact on federal-sector class cases ..... 14

D. Defendants improperly withhold discovery about whether the Suspension Directive has been fully rescinded and the sufficiency of their remedial actions ..... 17

E. Defendants must explain their redactions and produce nonprivileged material ..... 20

II. Defendants Must Provide a Privilege Log. ..... 20

III. Limited Depositions Are Necessary and Appropriate to Facilitate Judicial Review ..... 22

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Retired Ams. v. Bessent*,
No. CV 25-0313 (CKK), 2025 WL 1114350 (D.D.C. Mar. 20, 2025)....14, 15

*All. for Retired Ams. v. Bessent*,
No. CV 25-0313 (CKK), 2025 WL 2576530 (D.D.C. Mar. 4, 2025)....22

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*,
349 F.R.D. 243 (D.D.C. 2025) ....11, 23

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. CV 25-339
(JDB), 2025 WL 1129202 (D.D.C. Mar. 19, 2025)....11, 23

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab*, No. CV 25-339
(JDB), 2026 WL 1470287 (D.D.C. May 26, 2026) ....12–13, 18

*Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*,
96 F.R.D. 619 (D.D.C. 1983)....23

*Laxalt v. McClatchy*,
809 F.2d 885 (D.C. Cir. 1987)....16, 17, 19

*Molina v. U.S. Dep't of Homeland Sec.*,
832 F. Supp. 3d 22 (D.D.C. 2026)....23

*New York v. McMahon*,
826 F. Supp. 3d 184 (D. Mass. 2026)....23

*Oceana, Inc. v. Ross*, 920 F.3d 855 (D.C. Cir. 2019) ....21

*Tobey v. NLRB*,
40 F.3d 469 (D.C. Cir. 1994)....16

*Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*,
No. CV 25-1775 (BAH), 2026 WL 1500832 (D.D.C. May 29, 2026)......11, 12, 14, 15, 21, 23

*Venetian Casino Resort, L.L.C. v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008)....23

**Statutes**

5 U.S.C. § 552a(b)(3)....16, 17, 19

**Other Authorities**

71 Fed. Reg. 35342-01 (June 19, 2006) ... 19

77 Fed. Reg. 73694-02 (Dec. 11, 2012) ... 19

81 Fed. Reg. 81116-02 (Nov. 17, 2016) ... 17

91 Fed. Reg. 55690 (proposed Aug. 28, 2026) (to be codified at 29 C.F.R. pt. 1614) ... 13

U.S. Equal Emp. Opportunity Comm'n, *EEOC Acting Chair Lucas Announces Three Senior Agency Appointments* (July 24, 2025), https://www.eeoc.gov/newsroom/eeoc-acting-chair-lucas-announces-three-senior-agency-appointments ... 8

U.S. Equal Emp. Opportunity Comm'n, *Regina Stephens Named EEOC's New Chief Administrative Judge* (Oct. 21, 2022), https://www.eeoc.gov/newsroom/regina-stephens-named-eeocs-new-chief-administrative-judge ... 9

## INTRODUCTION

Defendants' discovery responses now confirm that EEOC officials did, in fact, direct a nationwide pause on federal-sector class complaint processing (the "Suspension Directive"). According to Defendants' newest version of their story:

> In the second half of 2025, the Chief Administrative Judge, who supervises the federal-sector hearings program within the Office of Field Programs, instructed her subordinate supervisors that pending class complaints were to be paused. That instruction was neither authorized by nor known to the Chair, the Office of the Chair, or the Commission. The instruction was first put in writing on December 5, 2025, and was transmitted to administrative judges beginning December 8, 2025.

Ex. A to Notice, Dkt. No. 33-1 ("Oct. 26 Resps."), Interrog. Resp. No. 1. Yet Defendants have inexplicably refused to produce *any* of these identified instructions and communications implementing the Suspension Directive, even though they are plainly responsive to Plaintiffs' discovery requests. Ex. A, Pls.' Interrogs. & Reqs, for Produc. ("Pls.' Reqs. for Disc."). And despite Plaintiffs' requests for this information in the meet-and-confer process, Defendants have entirely refused to provide additional documents or identify any legitimate basis for withholding discovery that this Court ordered. Ex. C at 1–3.

Defendants' document production consists of a mere eighteen pages, eight of which are scheduling orders already submitted to this Court. *See* Ex. B to Notice, Dkt. No. 33-2 [hereinafter EEOC_0000001–18]. The remaining materials are heavily redacted, exclusively postdate this lawsuit, and expose serious contradictions in the shifting account Defendants have offered to avoid judicial review. Those documents are wholly insufficient to allow the Court to "ascertain the contours of the precise policy at issue," which is not only necessary for facilitating judicial review on the merits but also "bears directly on Plaintiffs' standing." Mem. Op. at 3–4, Dkt. No. 30 ("Oct. 3 Mem. Op."); *see also* Mem. Op. & Order at 2–3, Dkt. No. 24.

The contradictions in Defendants' account of the challenged directive raise additional

questions that justify supplemental discovery. The clearest contradiction appears in an email sent by the EEOC's Chief Administrative Judge to senior counsel in the Office of the Chair on July 29, 2026—the day after this lawsuit was filed. In it, the Chief Administrative Judge stated, "AJ Ebron acted by direction," explaining that she had been instructed to pause class cases "as the program was so directed." EEOC_0000003. Two weeks later, Defendants told this Court that the Suspension Directive was "a fiction" and that the "EEOC *never issued* such a directive." Defs.' Opp'n to Mot. Prelim. Inj. & Stay at 9, Dkt. No. 18 ("Defs.' Opp'n to PI & Stay"). In a sworn declaration, they blamed Administrative Judge Erania Ebron for an "isolated incident" and presented her removal from *Pippen* as evidence of the agency's "good faith" to correct the one-off error. *Id.* at 8; Rose Decl. ¶¶ 3, 5, Dkt. No. 18-5. The agency's own records show that its explanation was materially misleading.

Defendants' discovery responses also raise more questions about the remedial measures they claim they took and whether the Suspension Directive still exists in some form or is likely to recur. It is now clear that Defendants removed Judge Ebron from the *Pippen* matter with full knowledge that she had acted by direction of her superiors pursuant to an instruction given to all administrative judges overseeing class cases. And the "[r]eminder" email sent to administrative judges in August actually suggests that at least some class cases may *continue* to be paused or delayed, and that the Chief Administrative Judge continues to "coordinate[]" directly with AJs handling matters that the agency believes are "potentially affected" by "novel binding authorities"—without explaining what any of that means. EEOC_0000017. While Plaintiffs are cognizant that the Court ordered only limited discovery, Defendants themselves have opened the door to further discovery on these questions by relying exclusively on post-hoc representations to deny that the Suspension Directive ever existed and to argue that the case is moot due to their

supposed remedial actions.

Because Defendants' discovery responses still fail to answer these central factual questions, thereby obstructing judicial review, Plaintiffs respectfully request an order compelling Defendants to provide complete answers to Interrogatory Nos. 1–9; provide complete responses to, and produce nonprivileged documents responsive to, to Request for Production Nos. 1–7; remove redactions of nonprivileged material; and produce a privilege log. Plaintiffs also request leave to take the deposition of the Chief Administrative Judge, limited to four hours, and potentially other officials who may have directed the Chief Administrative Judge to issue an agency-wide pause of federal-sector class actions.

## BACKGROUND

### I. Defendants Denied the Suspension Directive Existed Despite Substantial Evidence of a Coordinated Policy.

On December 10, 2025, Administrative Judge Ebron issued a "Notification of Case Processing Abeyance" in *Pippen v. Federal Bureau of Prisons*, cancelling deadlines and appearances and stating that the notification applied to all federal-sector class cases. Ex. I to Mot. Prelim. Inj., Dkt. No. 13-10. Judge Ebron explained that management had instructed her to pause the case two days earlier and quoted Supervisory Administrative Judge Kevin Rung: "On Pause are as follows: all class cases, not just those alleging disparate impact." Suppl. Burakiewicz Decl. Attach. 1, at 2, Dkt. No. 20-5. In June 2026, Judge Ebron advised that *Pippen* had been removed from "stay" status but that "case processing remains paused." When counsel sought clarification, she confirmed that there was no difference between a stay and a pause in processing. Ex. J to Mot. Prelim. Inj. at 3–4, Dkt. No. 13-11.

Plaintiffs filed this action on July 28, 2026, and sought preliminary relief on August 3, 2026. The Court ordered Defendants to produce the administrative record by August 13. Min.

Order, Aug. 4, 2026. Defendants produced none. They asserted that no administrative record existed because the EEOC had never issued the Directive. *See* Defs.' Opp'n to PI & Stay at 8 ("[T]here was no 'Suspension Directive.'"); *id.* at 9 ("[T]he challenged action is a fiction."); *id.* at 9 ("Plaintiffs' suspicions are without merit. EEOC *never issued* such a directive."); *id.* at 1 ("There is no administrative suspension order that the Court could lift."); *id.* at 9 ("Plaintiffs merely speculate about the [Suspension Directive's] existence based on a stray line in a single administrative judge's scheduling order."). Defendants characterized the stay in *Pippen* as an "isolated" error that was "promptly corrected" by removing Judge Ebron from the *Pippen* matter entirely. *See* Defs.' Opp'n to PI & Stay at 8 (claiming that the agency "demonstrated good faith" when it "promptly and voluntarily reassigned *Pippen* to a new administrative judge to ensure the matter continues apace"); Rose Decl. ¶¶ 3, 5. They also submitted August scheduling orders in *Pippen*, *Kelley*, and *Schildgen* and claimed that their voluntary actions had fully redressed Plaintiffs' injuries. Defs.' Opp'n to PI & Stay at 4; Exs. A–C to Defs.' Opp'n to PI & Stay, Dkt. Nos. 18-1–18-3.

Plaintiffs supplied substantial contrary evidence. In *Weimer v. U.S. Air Force*, involving a certified class of more than 10,000 Deaf employees, former employees, and applicants, the administrative judge cancelled a December 8, 2025, status conference and told counsel that he had been directed to halt class adjudication indefinitely. Musell Decl. ¶¶ 3–10, Dkt. No. 20-1. Other declarations described cancelled conferences, instructions that class cases could not proceed, and prolonged inaction across agencies and offices. Burakiewicz Decl. ¶¶ 3, 6, 7, Dkt. No. 13-6; Renner Decl. ¶¶ 2–6, Dkt. No. 20-2; Statman Decl. ¶¶ 1–10, Dkt. No. 20-3; Weeks Decl. ¶¶ 1–9, Dkt. No. 20-4. Spanning different agencies, judges, locations, claims, and procedural stages, these accounts identified at least ten paused class complaints beyond *Pippen*. Reply Mem. in Supp. of

Pls.' Mot. Prelim. Inj. at 3, Dkt. No. 20 ("Reply Mem. for PI").

Plaintiffs brought some of this evidence to defense counsel before completing preliminary-injunction briefing, but Defendants maintained their position. Their August 27 email emphasized the absence of another "actual stay order" and referred to a supposed "reminder" sent by the EEOC's Office of Field Programs in August that class cases should proceed "in the ordinary course." Ex. F to Reply Mem. for PI at 1, Dkt. No. 20-6. On September 2, the Court denied preliminary relief without prejudice but found Plaintiffs had provided "substantial . . . evidence" that the delays in class complaint processing resulted from a "coordinated policy." Mem. Op. at 9, Dkt. No. 22. Because only Defendants knew the contours of their actions, the Court ordered limited discovery. *Id.* at 10; Order at 1, Dkt. No. 21.

## II. Defendants Repeatedly Delayed Their Response to Discovery the Court Ordered.

Plaintiffs served appropriately tailored discovery requests on September 8, 2026. Instead of responding, Defendants moved to stay discovery pending a ruling on their forthcoming Rule 12(b)(1) motion and until "agency counsel completes their ongoing internal inquiry into the circumstances alleged in the Complaint," which would be completed "by the end of October." Defs.' Mot. for Leave to File Mot. Dismiss & Stay at 2, 4–5, Dkt. No. 23. Defendants represented that "Agency counsel commenced an internal inquiry after this lawsuit was filed to determine why the administrative judge in *Pippen v. Bureau of Prisons* issued the erroneous stay order," including by "reviewing internal documents and interviewing agency staff around the country." *Id.* at 4. The Court denied Defendants' request to stay discovery on October 3, explaining that the policy's scope bears directly on standing and that discovery could perform the function of an administrative record where the agency denied that any record existed. Oct. 3 Mem. Op. at 3–4.

Counsel thereafter scheduled a meet-and-confer videoconference for October 7, 2026.

Prior to their meeting, counsel for Defendants requested by email that Plaintiffs agree to extend their deadline to respond to discovery by two weeks until October 23, 2026, with discovery motions due November 6. Ex. B at 2. During the meeting, Plaintiffs offered compromises that would balance the EEOC's interest in completing its internal inquiry and Plaintiffs' interest in receiving timely discovery responses, but Defendants' counsel rejected them. In a follow-up email, Plaintiffs proposed a one-week extension of Defendants' deadline to respond conditioned on production of nonprivileged materials already collected by October 9. Plaintiffs' counsel reiterated that Plaintiffs "remain very concerned that delays in class action cases may continue to occur" and so "time is of the essence." Ex. B at 1. Defendants again refused to consider any compromise. *Id.* Because the parties could not agree on alternative deadlines, the Court's October 9 deadline remained in effect.

On October 9, Defendants served their discovery responses, nearly all of which refused to provide any answer on the basis that the EEOC is "conducting an inquiry into the circumstances that gave rise to this error," which the agency anticipated completing "by October 23." Ex. A to Pls.' Opp'n to Defs.' Mot. Dismiss at 3, Dkt. No. 31-1. On October 14, the Court ordered Defendants to serve updated responses and objections to Plaintiffs' discovery requests by October 26, "in the expectation that Defendants will have completed their internal investigation and provided more information to Plaintiffs, as promised, by this date." Min. Order, Oct. 14, 2026.

Before serving their October 26 responses, Defendants assured the Court that the forthcoming discovery would "confirm" that Plaintiffs' claims "are based on the false premise that the EEOC actually issued a Suspension Directive." Defs.' Reply in Supp. of Mot. Dismiss at 13, Dkt. No. 32. They described the pause as a mistake by "intermediate officials," promptly corrected by agency leadership, and asserted that the dispute was no longer live. *Id.* at 1, 9–10. Their

promised production did not substantiate those assurances.

## III. Defendants' Discovery Responses Reveal Contradictions in Their Prior Representations.

Defendants' October 26 interrogatory answers confirm that the pause originated above Judge Ebron and was nationwide. In the "second half of 2025," the Chief Administrative Judge instructed National Hearing Program Managers to pause pending class complaints; those managers relayed the direction through supervisory judges to administrative judges. Oct. 26 Resps., Interrog. Resp. Nos. 1, 4–5. Supervisory Administrative Judge Kevin Rung received the direction at a December 5 meeting with his superior, recorded it in his notes, and requested written confirmation. His supervisor, whose name and title Defendants did not disclose, issued the written instruction on December 5. Judge Rung then transmitted that direction in writing to administrative judges, including Judge Ebron, on December 8. *Id.*, Interrog. Resp. No. 7. While Defendants now admit that there was a nationwide suspension directive, they now call it an "incorrect internal processing procedure" undertaken without direction from or knowledge of "[a]gency leadership." *Id.*, Interrog. Resp. Nos. 4–5. They do not explain why the Chief Administrative Judge issued the directive or how "agency leadership"—a term Defendants do not define—could have remained unaware of the pause for at least seven months until this lawsuit was filed.

The accompanying production also contradicts Defendants' earlier account. It consists of eighteen pages, eight consisting of scheduling orders submitted in August. *See* EEOC_0000009–16. The remaining ten include two fully redacted pages, a nearly fully redacted page, and overlapping emails. *See* EEOC_0000001–08. None predates this litigation. The production shows that on July 29—the day after this litigation was filed—senior counsel to the Chair, Thomas Harward, emailed the Chief Administrative Judge for the purported reason of investigating the allegations in the complaint in order to "fully understand" why Administrative Judge Ebron

believed "there was a government-wide stop on class complaints" and "why she lifted the stay just last month but continued to tell the parties the case would not be processed." EEOC_0000001, EEOC_0000004; Oct. 26 Resps., Req. for Produc. Resp. Nos. 1, 8. The Chief Administrative Judge responded with a direct answer: "**AJ Ebron acted by direction**. I certainly hope we are not challenging her actions when **she was directed to 'pause' class cases as the program was so directed.** The stays were lifted at my direction after reviewing cases in ARC." EEOC_0000003 (emphasis added). That email went to Harward and Shannon Royce, the Chair's Chief of Staff[1]—weeks before Defendants told this Court that the Directive was a fiction and Judge Ebron's order an isolated error.

The production also raises questions about the supposed remedial measures that Defendants claim they took in response to Plaintiffs' allegations. A July 30 email to Office of Field Programs Director Thomas Colclough, the EEOC's Chief Operating Officer Sharon Rose, and a redacted recipient transmitted a "roadmap and sample order" for an "inventory meeting" scheduled for that day. EEOC_0000005. The attachments are redacted except for two bullets under the heading "*Pippen*": (1) "Reassign to new AJ; AJ Ebron recused because of pending litigation," and (2) "New AJ issues reassignment and scheduling order updating AJ Ebron's November 24, 2025 scheduling order with new dates." EEOC_0000006–08.

Thomas Colclough's August 24, 2026 "[r]eminder" email raises even more questions about the adequacy of Defendants' remedial measures and suggests that at least some class proceedings may still be paused or otherwise affected by directive of the Chief Administrative Judge:

> I believe a reminder to our AJ team is warranted. As an executive agency, all AJ opinions must align with applicable Executive Orders, DOJ OLC Opinions, and

[1] *See* U.S. Equal Emp. Opportunity Comm'n, *EEOC Acting Chair Lucas Announces Three Senior Agency Appointments* (July 24, 2025), https://www.eeoc.gov/newsroom/eeoc-acting-chair-lucas-announces-three-senior-agency-appointments.

> binding U.S. Supreme Court and OFS precedent, all of which continue to evolve. The initial inquiry in any matter should consider the text of the statutes and regulations we enforce, as well as these controlling authorities—not whether the complaint seeks class or individual relief.
>
> To be clear, **all federal sector class and individual cases that are not affected by novel binding authorities should proceed**, and should have been proceeding, in the ordinary course. **For matters that are potentially affected, my understanding is that the Chief AJ has already coordinated with AJs handling these matters to ensure appropriate processing that is tailored to the case at hand**.

EEOC_0000017 (emphasis added). Every recipient of this email is redacted.

### IV. Defendants Refuse to Produce Additional Responses or Documents After Plaintiffs Attempted to Confer About the Deficiencies.

On October 27, 2026, counsel for Plaintiffs offered to confer with Defendants about the deficiencies in their responses and production, as well as a potential protective order, in an attempt to resolve or narrow the parties' disputes. Specifically, Plaintiffs asked Defendants to produce copies of the written directive to pause class cases that Defendants describe in their interrogatory responses. Defendants' October 30 response confirmed that they were withholding responsive documents but supplied no request-specific explanation. Defendants refused to identify the Chief Administrative Judge (despite the fact that her identity appears to be publicly available[2]), explain her instruction, or provide a privilege log, calling further inquiry a "fishing expedition" because they had "filled in the blanks" identified by the Court. Ex. C at 1–4. On November 1, agency counsel finally answered Plaintiffs' follow-up request for the underlying suspension instruction: "I conferred with the agency about your follow up question. The EEOC declines to produce any additional documents." *Id.* at 1.

---

[2] *See* U.S. Equal Emp. Opportunity Comm'n, *Regina Stephens Named EEOC's New Chief Administrative Judge* (Oct. 21, 2022), https://www.eeoc.gov/newsroom/regina-stephens-named-eeocs-new-chief-administrative-judge.

## ARGUMENT

Defendants' discovery responses still fail to answer the central question that this Court ordered limited discovery to clarify: "whether and to what extent the [EEOC] adopted a policy of suspending the processing of federal-sector class complaints." Order at 1, Dkt. No. 21. Because their objections to doing so are entirely baseless, the Court should compel Defendants to produce complete discovery concerning the Suspension Directive's origin, effect, and purported rescission. The Court should also require Defendants to justify their heavy redactions, disclose any nonprivileged material, and provide a log. Finally, Plaintiffs request that the Court authorize limited depositions of relevant agency officials, beginning with the Chief Administrative Judge, to resolve material questions that Defendants' written responses leave unanswered.

### I. Defendants Must Produce Complete Discovery Concerning the Suspension Directive and Its Purported Rescission.

Defendants admit that high-level agency officials directed a nationwide pause in class complaint processing, yet withhold the directives, their basis, the affected dockets, and the evidence needed to test their claimed rescission. These are the central subjects of the discovery the Court ordered. *See* Mem. Op. at 9–10, Dkt. No. 22; Mem. Op. & Order at 2, Dkt. No. 24; Oct. 3 Mem. Op. at 3–4. Their unexplained omissions and selective disclosures obstruct the inquiry the Court authorized and frustrate judicial review.

#### A. <u>Defendants improperly withhold specific documents identified in their interrogatory responses.</u>

Defendants have refused to produce the instructions that their own answers identify as the sources of the nationwide pause on class processing. Request No. 1 expressly seeks Supervisory Administrative Judge Kevin Rung's December 8 email instructing the administrative judges he supervised to pause all class cases—the direction Judge Ebron quoted when explaining her stay order. *See* Suppl. Burakiewicz Decl. Attach. 1, at 2; Pls.' Disc. Reqs., Req. for Produc. No. 1.

Defendants also identify Supervisory Administrative Judge Rung's notes from the December 5 meeting at which he received the pause instruction and his supervisor's December 5 email confirming it in writing. Oct. 26 Resps., Interrog. Resp. No. 7. These documents are responsive to Requests Nos. 1–2. *See id.*, Req. for Produc. Nos. 1–2. None was produced, and Defendants have still not provided a specific basis on which they have been withheld.

Defendants face no undue burden in producing specifically identified documents that they reference in their interrogatory responses. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 349 F.R.D. 243, 252 (D.D.C. 2025) [hereinafter *AFL-CIO*] (finding discovery of "documents referenced" by agency in litigation materials was not "overly burdensome"), *reconsideration denied*, No. CV 25-339 (JDB), 2025 WL 1129202 (D.D.C. Mar. 19, 2025). The directives communicating the Suspension Directive are obviously relevant to a case challenging those directives. *See Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. CV 25-1775 (BAH), 2026 WL 1500832, at *8 (D.D.C. May 29, 2026) (ordering the agency, in an APA case, to produce documents reflecting the directives to implement the challenged policy, including who issued and the substance of that directive, and "instructions for how the policy was to be implemented").

Supervisory Administrative Judge Rung's contemporaneous notes from his December 5 meeting with his supervisor are particularly important because the instruction appears to have initially traveled orally. They bear directly on what he was told, by whom, and under what authority—questions that, in turn, bear directly on whether the Suspension Directive may recur and the adequacy of Defendants' remedial measures. In *Urban Sustainability Directors Network v. United States Department of Agriculture*, the court required the agency to produce any personal notes and summaries memorializing calls about a disputed policy, along with preparatory

documents, that "would memorialize what the agency considered in its policy." *Id.* at *9. The same should be ordered here.

B. <u>Defendants improperly withhold discovery about the origin and basis of the Chief Administrative Judge's directive.</u>

Defendants' answers place the Chief Administrative Judge at the center of the Suspension Directive but leave the basis for her decision entirely unexplained. Her July 29 email states that the hearings program "was so directed" to pause class complaint processing. EEOC_0000003. Interrogatory Nos. 1 and 3–7 and Requests Nos. 1–2 seek the source and substance of that direction, its rationale, the responsible officials, and the communications transmitting it through the supervisory chain. *See* Pls.' Reqs. for Disc. Pointing to successive messengers of the Directive does not answer those central questions.

After Defendants' October 26 responses revealed the Chief Administrative Judge's central role in communicating the Suspension Directive, Plaintiffs asked them to "identi[f]y her, state why she made that decision, identify any instructions or communications she received that led to issuing the pause instruction," and explain "how and to whom the decision was transmitted and implemented." Ex. C at 4. Defendants refused, asserting that there was "no need" or "legal basis" for further discovery and calling it a "fishing expedition." *Id.* at 2. They claimed to have "filled in the blanks" the Court identified concerning "why the Administrative Judge [in *Pippen*] issued this order [*i.e.*, the Notification of Case Processing Abeyance on December 10, 2025] or believed it applied to all cases in the federal sector." *Id.* at 2 (quoting Oct. 3 Mem. Op. at 3.). That deliberate misreading ignores that the Court clearly ordered discovery to determine what the agency *actually did* and the *basis* for its action. *See* Oct. 3 Mem. Op. at 3–4. Defendants cannot confine judicial review to their post-hoc account while withholding the evidence Plaintiffs need to establish the Directive's existence and whether the agency considered the factors the APA requires. *Am. Fed'n*

*of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab*, No. CV 25-339 (JDB), 2026 WL 1470287, at *3 (D.D.C. May 26, 2026) (ordering supplemental discovery in APA case needed to "mitigate any prejudice plaintiffs might otherwise suffer from the Agencies' introduction of declarations containing post hoc explanations.").

Defendants' newest story is also implausible on its own terms. Defendants do not even attempt to explain why the Chief Administrative Judge would suddenly decide, in the "second half of 2025," to issue an unprecedented order halting class case processing nationwide. *See* Oct. 26 Resps., Interrog. Resp. No. 1. They ask this Court to believe she acted entirely on her own while "agency leadership"—a term Defendants still refuse to define—remained unaware for at least *seven months* that the Chief Administrative Judge, national program managers, supervisory judges, and administrative judges had stopped processing class complaints. Oct. 26 Resps., Interrog. Resp. Nos. 1, 5–6. Meanwhile, the agency was quietly developing a rule to eliminate administrative class complaints entirely, without listing it on its regulatory agenda or publicly announcing it until late August 2026. *See* Reply Mem. for PI at 11 & n.3.[3] The suggestion that the Chief Administrative Judge independently halted pending class cases for no discernable reason while the agency pursued the same objective through rulemaking strains credulity. Even accepting Defendants' story, a

---

[3] The timing of these actions warrants inquiry into whether the suspension was connected to the Commission's preparation of its proposed rule to eliminate jurisdiction over administrative class actions altogether. The August 28 NPRM states that the Commission does not intend the rule to "reopen *final* Commission decisions, *final* agencies decisions, other *final* agency actions, settlement agreements, or court judgments that became *final* before the effective date of a final rule." Federal Sector Equal Employment Opportunity, 91 Fed. Reg. 55690, 55709 (proposed Aug. 28, 2026) (emphasis added) (to be codified at 29 C.F.R. pt. 1614). That language raises serious concerns that the agency's motive in pausing or otherwise delaying class cases is to prevent them from reaching a final decision before the effective date of any final rule. The NPRM provides no indication of how pending class complaints, including *Pippen*, would be affected if they do not reach final decision by the effective date, leaving them exposed to whatever transition rules the Commission ultimately adopts. Further discovery would clarify whether this was in fact the reason for the suspension.

months-long nationwide halt that escaped leadership's notice until this lawsuit raises serious questions about the agency's oversight of its hearings program and the likelihood of recurrence. Either account requires discovery into who directed the pause and why—the precise questions that the Court ordered discovery to answer.

In *Urban Sustainability*, the court required the agency in an APA case to produce discovery about a disputed policy's implementing directions, their source, and the stated rationale. 2026 WL 1500832, at *8. Defendants must supply the same information here. Because their nearly three-month inquiry should have already allowed Defendants to obtain the answers to these questions and the responsive documents, the agency cannot claim that responding to these limited requests is unduly burdensome.

C. Defendants improperly withhold discovery about the full scope of the Suspension Directive's impact on federal-sector class cases.

Interrogatory No. 2 and Request for Production No. 3 seek identification of pending federal-sector class complaints, their assigned judges and offices, counsel, procedural status, docket activity, and whether processing stopped and resumed. *See* Pls.' Reqs. for Disc. That information is needed by Plaintiffs to probe the veracity of Defendants' assertions that no case other than *Pippen* was stayed and that the normal processing of all cases has now resumed. Defendants' refusal to provide that information is untenable for four reasons.

*First*, this APA action challenges an agency-wide policy, and Defendants now admit that the instruction was not "isolated" to *Pippen* and instead extended to pending class complaints generally. Oct. 26 Resps., Interrog. Resp. Nos. 1, 4–5. Its full reach and impact are essential to understanding the challenged action and the injuries it caused. *See All. for Retired Ams. v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 1114350, at *3 (D.D.C. Mar. 20, 2025) (Kollar-Kotelly, J.) ("To evaluate the reasonableness and lawfulness of Defendants' decision to take those actions, this

Court requires an adequate record of exactly what actions Defendants took."); *Urban Sustainability*, 2026 WL 1500832, at *1–2 (rejecting agency's attempt to limit discovery to the plaintiffs' grant terminations where plaintiffs' APA claims "challenge[d] both the terminations of their own grants as well as defendants' adopted policy").

*Second,* Defendants have opened the door to this discovery by introducing post-litigation explanations purporting to establish that *Pippen* was an isolated incident. Sharon Rose, the EEOC Chief Operating Officer, characterized the *Pippen* abeyance notification as "an isolated incident of an administrative judge's order issued in error." Rose Decl. ¶ 5. Defendants' interrogatory answers similarly claim that the EEOC found no other "order" issued in any other case that was "similar to" the *Pippen* order. Oct. 26 Resps., Interrog. Resp. No. 4. Additional discovery is needed to test that evidence. Plaintiffs' theory is that most administrative judges implemented the pause without entering an order notifying the parties. And the Chief Administrative Judge's own reference to lifting "stays," plural, after reviewing cases in ARC raises further questions about what Defendants mean when they say they found no stay order "similar" to the *Pippen* notification. EEOC_0000003; Oct. 26 Resps., Interrog Resp. No. 4. Only Defendants have access to the complete docket and their internal instructions. They cannot select favorable snippets while withholding the information Plaintiffs need to prove their claims. *See All. for Retired Ams.*, 2025 WL 1114350, at *2–3 (discovery is proper in an APA case where the challenged actions are disputes and "only the Defendants know the 'contours' of those actions." (quoting *Venetian Casino Resort, L.L.C. v. EEOC*, 409 F.3d 359, 367 (D.C. Cir. 2005))).

*Third*, the asserted burden is minimal. Defendants say that EEOC officials reviewed every pending class matter at a July 30 meeting—two days after this suit was filed—to determine whether the cases were proceeding. Oct. 26 Resps., Interrog. Resp. No. 8. Thomas Harward's July

29 email also announced a plan to interview other judges about the status of their class cases and whether they had issued or received instructions like Judge Ebron's. EEOC_0000001, EEOC_0000004. And the Chief Administrative Judge identified "ARC" as the source she used to review cases and remove "stays." EEOC_0000003. If Defendants performed the investigation they describe, this information should already be known and assembled, or at least easily accessible through the "ARC" system.

*Fourth*, the Privacy Act does not justify withholding information about the agency's class proceedings. As an initial matter, the D.C. Circuit has held that information "about" administrative cases, "such as the case name, the allegations made, the number of private-sector employees involved and the date of settlement, hearing, dismissal or closing of the case," is not "about" a particular individual and thus not implicated by the Privacy Act. *Tobey v. NLRB*, 40 F.3d 469, 471 (D.C. Cir. 1994). The same is true here. Information from the "ARC" system about the status of class complaints and procedural events in those proceedings does not require disclosure of personally identifiable information that would be protected by the Privacy Act.

To the extent that responsive information may include personally identifiable information, it is well-settled in the D.C. Circuit that the Privacy Act provides no qualified discovery privilege that would bar the EEOC from disclosing information subject to the Act's coverage in this litigation. *See Laxalt v. McClatchy*, 809 F.2d 885, 888 (D.C. Cir. 1987). Rather, Plaintiffs may obtain "discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards." *Id.* at 889. The Privacy Act also expressly permits disclosure of materials "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. § 552a(b)(11). Although Defendants should have already produced the requested materials for the reasons above, the Court may also expressly authorize and direct the responsive disclosures under

5 U.S.C. § 552a(b)(11) for the avoidance of any doubt.

Moreover, the EEOC's own regulations implementing the Privacy Act expressly permit disclosure of federal-sector complaint and hearing records in litigation involving the Government and in response to discovery seeking relevant information. *See* Publication of Notices & Proposed New Systems of Records, 81 Fed. Reg. 81116-02, 81135–36 (Nov. 17, 2016) (EEOC/GOVT-1, routine uses b and e); 5 U.S.C. § 552a(b)(3). And Defendants themselves already publicly filed scheduling orders naming parties and judges from three administrative class proceedings when those records supported their position. Exs. A–C to Defs.' Opp'n to PI & Stay, Dkt. Nos. 18-1–18-3. They offer no coherent reason to withhold comparable information now.

While the Privacy Act provides no basis for the EEOC to withhold responsive materials altogether, it may provide a reason for the Court to enter a protective order in the appropriate circumstances. *See Laxalt*, 809 F.2d at 888–89. On October 27, Plaintiffs offered "to enter into an appropriate protective order or discuss other arrangements that will provide the security that [Defendants] believe the Privacy Act requires" and were "prepared to review any measures the EEOC wishes to propose pursuant to the Privacy Act." Ex. C at 4. However, Defendants ignored Plaintiffs' offer. *Id.* at 1–3. In addition to compelling disclosure, the Court should also direct Defendants to promptly confer with Plaintiffs on any necessary, narrowly tailored safeguards.

D. Defendants improperly withhold discovery about whether the Suspension Directive has been fully rescinded and the sufficiency of their remedial actions.

Requests Nos. 4–7 and Interrogatory Nos. 8–9 seek discovery about Defendants' claimed remedial measures, including termination of the pause, resumption of processing, and prevention of recurrence. *See* Pls.' Reqs. for Disc. Defendants cannot refuse to provide information responsive to these requests while also asking the Court to find that the Plaintiffs' harm was minimal and that

the agency's subsequent actions have fully addressed that harm based on its own cherry-picked post-hoc representations.

*First*, this discovery is necessary both to ascertain the challenged policy's contours and to resolve the jurisdictional questions Defendants themselves raised. The Court expressly recognized its relevance to the mootness and voluntary cessation questions. Mem. Op. & Order at 2, Dkt. No. 24. From the outset, Defendants have relied on post-hoc, post-litigation evidence that they supposedly acted promptly and in good faith to remedy the challenged practices: removing Judge Ebron, obtaining three scheduling orders, and having the Office of Field Programs Director send a reminder. Defs.' Opp'n to PI & Stay at 3–4, 8; Defs.' Reply in Supp. of Mot. Dismiss at 9–10. They opened the door to discovery concerning those actions. Thus, their objection that APA review ordinarily concerns events up to the time of the challenged decision cannot insulate the later events on which their mootness defense depends. "Allowing the [EEOC] to leverage the facts available to them . . . while prohibiting plaintiffs from probing any of the factual bases for those declarations, risks significant prejudice to plaintiffs." *Am. Fed'n of Lab. & Congr. Of Indus. Orgs.*, 2026 WL 1470287, at *4.

The new production makes the inquiry into Defendants' claimed remedial measures even more urgent. Defendants offered Judge Ebron's removal from *Pippen* as proof of "good faith," although the Chief Administrative Judge had already told senior officials that Judge Ebron "acted by direction." Defs.' Opp'n to PI & Stay at 8; EEOC_0000003. The July 30 roadmap proposed replacing her because of "pending litigation," not because the agency wanted to ensure timely processing of the *Pippen* matter. EEOC_0000006. Defendants have never explained how assigning a new judge with no institutional knowledge of this certified class case would accelerate, rather than delay, its resolution. Those records heighten Plaintiffs' previously raised concerns that Judge

Ebron was scapegoated for following the agency's instruction and retaliated against for revealing it in a written order. Reply Mem. for PI at 8–9 & n.2.[4] Nor do single scheduling orders in *Pippen* and two other matters rebut Plaintiffs' evidence of other stalled cases or establish that processing resumed, and has continued to move forward, since those August orders.

Thomas Colclough's August 24 "[r]eminder" email likewise does not say what Defendants claim. Their repeated assurances that the reminder ensured ordinary processing omit its express qualification: cases unaffected by "novel binding authorities" should proceed ordinarily, while "potentially affected" cases were subject to further unspecified action by the Chief Administrative Judge. EEOC_0000017. Colclough's email also states his "understanding" that the Chief Administrative Judge had coordinated with assigned judges about how they should be processing "potentially affected" cases, which raises additional questions about why the same official to whom Defendants attribute the erroneous months-long nationwide pause apparently continued to direct processing under the supposed remedy. That continued role requires an explanation of what instructions governed the affected cases and what measures would prevent recurrence.

*Second,* the Privacy Act does not shield these materials. Defendants' invocation of OPM/GOVT-1, -2, and -3 creates no discovery privilege. *Laxalt*, 809 F.2d at 888–89. Like the EEOC, OPM has also expressly permitted disclosure of records from those systems for litigation-related routine uses, and § 552a(b)(11) independently permits court-ordered disclosure. *See* Privacy Act of 1974: Update Existing System of Records, 77 Fed. Reg. 73694-02, 73696–97 (Dec. 11, 2012); Proposed New Routine Use & Amendment of Category of Records, 71 Fed. Reg. 35342-01, 35348, 35350 (June 19, 2006). And, as discussed above, any legitimate confidentiality

[4] Plaintiffs have also learned that Administrative Judge Richard Peterson is no longer presiding over the *Weimer* matter and unexpectedly resigned from his position shortly after Plaintiffs identified him and the information he revealed to the parties about the unlawful directive.

concern can be addressed through a narrowly tailored protective order.

*Third*, there is limited burden on the agency to produce these materials as Defendants' ostensibly extensive investigation should already have gathered the information. Their production identifies the Chief Administrative Judge's conversation with the Chair's Chief of Staff (Shannon Royce), a July 29 meeting with Judge Ebron, proposed follow-up with her supervisors, and a July 30 inventory meeting for which Harward circulated the roadmap and sample order. EEOC_0000001, EEOC_0000003–05. It should not be an undue burden for Defendants to produce nonprivileged records of those events, such as contemporaneous notes and resulting instructions, given that they have already investigated these events and invoked them as grounds for dismissal.

### E. Defendants must explain their redactions and produce nonprivileged material.

The heavy redactions throughout Defendants' limited production conceal the identity of the Chief Administrative Judge, other participants in relevant communications, every recipient of the August 24 email, portions of Harward's email, and nearly the entire roadmap and sample order attached to Harward's July 30 email. EEOC_0000001–08, EEOC_0000017. Defendants have not supplied any explanation that would permit Plaintiffs or the Court to determine which redactions rest on privilege, privacy, or some other objection. Defendants must identify the ground for each redaction, produce all material for which no valid protection is established, and provide sufficient information to assess any remaining claim.

## II. Defendants Must Provide a Privilege Log.

Defendants have withheld responsive documents and information based on blanket invocations of the "deliberative-process, attorney-client, and work-product privileges." *See* Oct. 26 Resps., Objs. to Interrogs. Nos. 1–8, Objs. to Req. for Produc. Nos. 1, 2, 4–7. But Defendants refuse to provide a privilege log that would enable Plaintiffs or the Court to ascertain which

materials were withheld and on what basis, whether they are relevant, and whether they contain information available from another source. That is improper.

Defendants' refusal to produce a privilege log is based entirely on *Oceana, Inc. v. Ross*. *See* Oct. 26 Resps., Objs. to Interrog. Nos. 1–8, Objs. to Req. for Produc. Nos. 1, 2, 4–7 (citing 920 F.3d 855, 865 (D.C. Cir. 2019)). But *Oceana* is plainly inapplicable here because Defendants have not produced any administrative record. The rationale in *Oceana* was that, in an ordinary APA case, because predecisional documents would not typically be included in an administrative record to begin with, they "do not need to be logged as withheld from the administrative record." 920 F.3d at 865.[5] Rather than a privilege log, "on APA review, the agency must submit '[p]roper certification' that the record is complete, which serves as 'formal representation by the [agency]' that it duly evaluated all predecisional documents before excluding them from the record." *Id.* (quoting *Norris & Hirshberg v. Sec. & Exch. Comm'n*, 163 F.2d 698, 694 (D.C. Cir. 1947)). That rationale does not apply here, where the agency has produced no certified administrative record.

Indeed, the *Oceana* court expressly distinguished situations where "the record was incomplete," or "the agency improperly supplemented the record with 'post hoc rationalizations' supporting its actions," or "a redacted document was placed in the administrative record and there was a credible showing that the redactions may have obscured 'factual information not otherwise in the record.'" *Id.* at 865. Such situations, the court held, "would justify further action or inquiry by the District Court." *Id.* So too here. Indeed, the same argument was rejected on these grounds in *Urban Sustainability*, where the court required a privilege log under *Oceana*'s exception for APA cases where the administrative record is incomplete. *See* 2026 WL 1500832, at *11.

---

[5] Plaintiffs also believe that some predecisional documents may still be discoverable in light of Defendants' demonstrated "bad faith or improper behavior" in their misrepresentations to the Court throughout this litigation, as discussed above. *See Oceana*, 920 F.3d at 865.

In any event, even if the EEOC had produced and certified an administrative record, *Oceana* would only apply to predecisional materials—not materials withheld on the basis of attorney-client, work-product, or any other privilege. *See All. for Retired Ams. v. Bessent*, No. CV 25-0313 (CKK), 2025 WL 2576530, at *1–2 (D.D.C. Mar. 4, 2025) (finding *Oceana*'s "rationale does not apply to privileged materials that are neither predecisional nor deliberative, since those materials are not necessarily 'irrelevant'").

In an attempt to resolve or narrow the parties' disputes prior to this motion, Plaintiffs' counsel communicated the position above to Defendants' counsel, requesting that the agency reconsider its position and either produce the withheld materials or produce a privilege log sufficient to assess each asserted protection. Ex. C at 3–4. Defendants refused and stood by their incorrect position that "the principles underlying *Oceana* . . . apply equally here" because this "is an APA case." *Id.* at 2. They asserted, without support, that "[i]f deliberative documents are immaterial and need not be logged when an agency actually took a final action, there is no reason to impose the greater burden of logging documents when the agency has not acted." *Id.* The *Oceana* decision, of course, does not suggest that agencies are exempt from their discovery obligations if they disagree about the scope or finality of the challenged action. And Defendants' continued insistence that the agency "has not acted" despite mounting evidence to the contrary provides an even stronger reason to require Defendants to produce a privilege log to ensure the agency is producing all nonprivileged documents necessary for resolving the factual dispute. *See id.* Thus, Defendants must produce a log for responsive materials withheld on the basis of any privilege.

## III. Limited Depositions Are Necessary and Appropriate to Facilitate Judicial Review.

In addition to the supplemental written discovery requested above, Plaintiffs seek leave to

take limited depositions necessary to clarify the "contours of the precise policy" at issue and facilitate effective judicial review. *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008). Defendants have now identified the Chief Administrative Judge as an official who directed the pause on class cases, but they entirely refuse to explain the basis for that instruction. And their claim that the Chief Administrative Judge acted without direction from or the knowledge of "agency leadership" strains credulity and contradicts her statement that "the program was so directed." Oct. 26 Resps., Interrog. Resp. Nos. 4, 6; EEOC_0000003. Limited depositions of the responsible officials, starting with the Chief Administrative Judge, are necessary and appropriate in these circumstances.

Limited depositions are an established means of developing the record in APA cases involving disputed policies. *See AFL-CIO*, 349 F.R.D. at 246, 251–54 (authorizing four Rule 30(b)(6) depositions addressing the scope and implementation of the challenged practices, organizational structure, authority, and employees' roles.); *Molina v. U.S. Dep't of Homeland Sec.*, 832 F. Supp. 3d 22, 36, 54 (D.D.C. 2026) (granting request for up to five depositions, in addition to written discovery, where the agencies challenged that the policy existed and the administrative record totaled eleven pages); *New York v. McMahon*, 826 F. Supp. 3d 184, 202 (D. Mass. 2026) (granting request for depositions and written discovery limited to the "decision-making process" regarding the challenged policy); *Cmty. Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 96 F.R.D. 619, 621 (D.D.C. 1983) ("[A]n inadequate administrative record, or none at all, may warrant a deposition of an agency official."); *Urb. Sustainability*, 2026 WL 1500832, at *12 ("[I]n cases where the administrative record is inadequate on its face and the government denies the existence of a challenged policy, discovery in the form of depositions may be the only or best option to clarify the record about the agency's actions." (citation omitted)). Those decisions

support the Court's authority to permit the narrowly confined examinations requested here.

Specifically, Plaintiffs request leave to conduct depositions starting with the EEOC's Chief Administrative Judge. Plaintiffs propose limiting the deposition of the Chief Administrative Judge to four hours and four narrow topics: (1) the basis for her decision to pause class complaint processing, (2) how and when she directed the pause, (3) the basis for and scope of any remedial measures implemented to rescind the directive and ensure resumption of class case processing, and (4) the scope of her role and authority to act on behalf of the agency. Plaintiffs also seek permission to potentially depose other officials who may have directed the Chief Administrative Judge to issue the agency-wide pause, as necessary.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant their Motion and order Defendants to serve supplemental answers to Interrogatory Nos. 1–9; provide complete responses and produce documents responsive to Request Nos. 1–7; remove unsupported redactions; and provide a privilege log. Plaintiffs also request that the Court authorize limited depositions of relevant agency officials, beginning with the Chief Administrative Judge.

November 2, 2026

Respectfully submitted,

*/s/ Joseph M. Sellers*

Joseph M. Sellers (D.C. Bar No. 318410)
Phoebe M. Wolfe (D.C. Bar No. 90014711)
Cohen Milstein Sellers & Toll LLP
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
jsellers@cohenmilstein.com
pwolfe@cohenmilstein.com

Heidi R. Burakiewicz (D.C. Bar No. 473973)
Burakiewicz & DePriest
1120 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20036
Tel: (202) 856-7500
Fax: (202) 217-2599
hburakiewicz@bdlawdc.com

Harold Craig Becker (D.C. Bar No. 371239)
Taryn Wilgus Null (D.C. Bar No. 985724)
Tianna J. Mays (D.C. Bar No. 90005882)
Democracy Defenders Fund
600 Pennsylvania Avenue, S.E., No. 15180
Washington, D.C. 20003
Tel: (202) 594-9958
craig@democracydefenders.org
taryn@democracydefenders.org
tianna@democracydefenders.org

*Counsel for Plaintiffs*
Rushab B. Sanghvi (D.C. Bar No. 1012814)
Andres M. Grajales (D.C. Bar No. 476894)
American Federation of Government
Employees, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Tel: (202) 639-6426
SanghR@afge.org
Grajaa@afge.org

*Counsel for Plaintiff American Federation of Government Employees (AFGE)*